# Appeal No. 11-57137

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

OMEGA S.A.,

*Appellant,*

vs.

COSTCO WHOLESALE CORPORATION,

*Appellee.*

On Appeal From the United States District Court
for the Central District of California
Hon. Terry J. Hatter, Jr.
Case No. 2:04-CV-05443 TJH (RCx)

## APPELLEE'S ANSWERING BRIEF

Norman H. Levine
Aaron J. Moss
Greenberg Glusker Fields
Claman & Machtinger LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California  90067-4590
Telephone:  310.553.3610
Facsimile:  310.553.0687

Bruce P. Keller
Jeffrey P. Cunard
Debevoise & Plimpton LLP
555 13th Street, N.W.,
Suite 1100 East
Washington, D.C.  20004
Telephone:  202.383.8043
Facsimile:  202.383.8118

Attorneys for Appellee
Costco Wholesale Corporation

# Appeal No. 11-57137

_____

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

_____

OMEGA S.A.,

*Appellant,*

vs.

COSTCO WHOLESALE CORPORATION,

*Appellee.*

_____

On Appeal From the United States District Court
for the Central District of California
Hon. Terry J. Hatter, Jr.
Case No. 2:04-CV-05443 TJH (RCx)

_____

## APPELLEE'S ANSWERING BRIEF

_____

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Costco Wholesale Corporation states that

Davis Selected Advisers, LP controls 10% or more of its corporate stock.

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ........................................................1

COUNTER-STATEMENT OF ISSUES PRESENTED ..........................................1

COUNTER-STATEMENT OF THE CASE ...........................................................3

COUNTER-STATEMENT OF FACTS ...................................................5

SUMMARY OF THE ARGUMENT .......................................................9

ARGUMENT ...................................................................14

I.    THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT IN FAVOR OF COSTCO ON THE AFFIRMATIVE DEFENSE OF COPYRIGHT MISUSE ....................................................14

    A.    The Purpose Of The Copyright Act Is To Enrich The Culture By Encouraging The Production Of Creative Works ........................14

    B.    The Use Of A Copyright Contrary To The Purposes Of The Act Constitutes Copyright Misuse ............................................15

    C.    Omega's Conduct Falls Clearly Within The Copyright Misuse Doctrine ................................................20

    D.    Omega's Conduct Does Not Advance The Goals Of Copyright .......26

    E.    The Undisputed Facts Confirm That Omega Used Its Copyright To Control The Distribution Of A Physical Object That Could Otherwise Be Freely Traded ............................................29

    F.    Omega's View Of Copyright Improperly Extends The Boundaries of Copyright Into The Realm Of Trademark .................32

    G.    Allowing Omega To Control Importation And Distribution of Products That Are Not Copyrightable Would Have Far-Reaching Consequences Antithetical to Competition ........................35

    H.    Omega's Remaining Arguments Are Unavailing ..............................36

# TABLE OF CONTENTS
## (continued)

**Page**

II.    THE DISTRICT COURT PROPERLY DENIED PARTIAL SUMMARY JUDGMENT IN OMEGA'S FAVOR ON COSTCO'S AFFIRMATIVE DEFENSE BASED ON COPYRIGHT MISUSE............45

CONCLUSION........................................................................................45

CERTIFICATE OF COMPLIANCE  PURSUANT TO FED. R. APP. P. 32(A)(7)(C) ...................................................................................46

# TABLE OF AUTHORITIES

**Page**

CASES

*A&M Records, Inc. v. Napster*,
239 F.3d 1004 (9th Cir. 2001) ..........................................................10, 21, 40, 41

*Advanced Computer Servs. of Mich., Inc. v. MAI Sys. Corp.*,
845 F. Supp. 356 (E.D. Va. 1994) ....................................................................41

*Alcatel USA, Inc. v. DGI Techs, Inc.*,
166 F. 3d 772 (5th Cir. 1999) .............................................................17, 21, 37

*Apple Inc. v. Psystar Corp.*,
658 F.3d 1150 (9th Cir. 2011) ....................................................................passim

*Arista Records, Inc. v. Flea World, Inc.*,
356 F. Supp. 2d 411 (D.N.J. 2005)....................................................................41

*Assessment Techs. of WI, LLC v. WIREdata, Inc.*,
350 F.3d 640 (7th Cir. 2003) .............................................................17, 21, 22

*Brown v. Plata*,
131 S. Ct. 1910 (2011)....................................................................43, 44

*Chamberlain Grp., Inc. v. Skylink Techs., Inc.*,
381 F.3d 1178 (Fed. Cir. 2004) ....................................................................23, 24, 25

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
539 U.S. 23 (2003)........................................................................12, 33

*Denbicare U.S.A., Inc. v. Toys "R" Us, Inc.*,
84 F.3d 1143 (9th Cir. 1996) ....................................................................30, 39

*Enesco Corp. v. Price/Costco Inc.*,
146 F.3d 1083 (9th Cir. 1998) .........................................................................34

*Ford Motor Co. v. Summit Motor Prods., Inc.*,
930 F.2d 277 (3d Cir. 1991) .............................................................................32

*Fox Film Corp. v. Doyal*,
286 U.S. 123 (1932)........................................................................15

*Harper & Row, Pubs., Inc. v. Nation Enters.*,
471 U.S. 539 (1985)........................................................................15, 32

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Holland v. Florida*,
  130 S. Ct. 2549 (2010)........................................................................18

*In re Mitan*,
  573 F.3d 237 (6th Cir. 2009) .............................................................43

*In re Napster, Inc. Copyright Litig.*,
  191 F. Supp. 2d 1087 (N.D. Cal. 2002)........................................17, 38

*Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*,
  552 F.3d 1033 (9th Cir. 2009) ...........................................................42

*Kieselstein-Cord v. Accessories by Pearl, Inc.*,
  632 F.2d 989 (2d Cir. 1980) ...............................................................39

*Kirtsaeng v. John Wiley & Sons, Inc.*,
  654 F.3d 210 (2d Cir. 2011), *cert. granted*,
  80 U.S.L.W. 3365 (Apr. 16, 2012) .....................................................30

*Lasercomb Am., Inc. v. Reynolds*,
  911 F.2d 970 (4th Cir. 1990) .......................................................passim

*Latimer v. Roaring Toyz, Inc.*,
  601 F.3d 1224 (11th Cir. 2010) .........................................................39

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  387 F.3d 522 (6th Cir. 2004) .......................................................24, 25

*Mazer v. Stein*,
  347 U.S. 201 (1954)......................................................13, 36, 37, 38

*MDY Indus., LLC v. Blizzard Entm't, Inc.*,
  629 F.3d 928 (9th Cir. 2010) .......................................................10, 17

*Micro Star v. Formgen Inc.*,
  154 F.3d 1107 (9th Cir. 1998) ...........................................................41

*Morton Salt Co. v. G.S. Suppiger Co.*,
  314 U.S. 488 (1942).....................................................................18, 19

*NEC Elecs. v. CAL Circuit Abco*,
  810 F.2d 1506 (9th Cir. 1987) ...........................................................34

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Omega S.A. v. Costco Wholesale Corp.*,
541 F.3d 982 (9th Cir. 2008), *aff'd*, 131 S. Ct. 565 (2010) ............................30, 4

*Omega S.A. v. Costco Wholesale Corp.*,
CV 04-05443, slip op. (C.D. Cal. Jun. 20, 2012) .................................................5

*Omega S.A. v. Costco Wholesale Corp.*,
CV 04-05443, slip op. (C.D. Cal. Nov. 9, 2011).........................................12, 17

*Parfums Givenchy, Inc. v. Drug Emporium, Inc.*,
38 F.3d 477 (9th Cir. 1994) ........................................................................30, 39

*Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*,
121 F.3d 516 (9th Cir. 1997) ....................................................................passim

*QAD Inc. v. ALN Assocs., Inc.*,
770 F. Supp. 1261 (N.D. Ill. 1991), *aff'd*, 974 F.2d 834 (7th Cir. 1992)...........20

*Qualitex Co. v. Jacobson Prods. Co.*,
514 U.S. 159 (1995).......................................................................................33

*Quality King Distribs., Inc. v. L'anza Research Int'l*,
523 U.S. 135 (1998).......................................................................................39

*Religious Tech. Ctr. v. Lerma*,
Civ A. No. 95-1107-A, 1996 WL 633131 (E.D. Va. Oct. 4, 1996) .............20, 42

*Rosenthal v. Stein*,
205 F.2d 633 (9th Cir. 1953) .........................................................................40

*Sassafras Enters., Inc. v. Roshco, Inc.*,
889 F. Supp. 343 (N.D. Ill. 1995)....................................................................28

*SmithKline Beecham Consumer Healthcare L.P. v. Watson Pharms., Inc.*,
211 F.3d 21 (2d Cir. 2000) .............................................................................28

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984).........................................................................................32

*Swatch S.A. v. New City, Inc.*,
454 F. Supp. 2d 1245 (S.D. Fla. 2006)..............................................................40

# TABLE OF AUTHORITIES
## (continued)

Page

*Ticketmaster LLC v. RMG Techs., Inc.*,
   536 F. Supp. 2d 1191 (C.D. Cal. 2008) ....................................................17

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.*,
   532 U.S. 23 (2001) ....................................................................................34

*Twentieth Century Music Corp. v. Aiken*,
   422 U.S. 151 (1975) ..................................................................................11

*United States v. Paramount Pictures, Inc.*,
   334 U.S. 131 (1948) ..................................................................................15

*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*,
   342 F.3d 191 (3d Cir. 2003) ...............................................................17, 18

*Washingtonian Publ'g Co. v. Pearson*,
   306 U.S. 30 (1939) ..............................................................................10, 14


STATUTES

17 U.S.C. § 101. ...............................................................................................2

17 U.S.C. § 106(1) ........................................................................................38

17 U.S.C. § 106(3) ..............................................................12, 29, 30, 32, 36

17 U.S.C. § 109(a) .........................................................................................30

17 U.S.C. § 113(a) .............................................................................13, 36, 38

17 U.S.C. § 202 ......................................................................................12, 29

17 U.S.C. § 1201 ..............................................................................23, 24, 25, 27

1971 Sound Recordings Amendment Act, § 1(a), 85 Stat. 391..............................31

Copyright Act of 1790, § 1, ch. xv, 1 Stat 124 ......................................................31

Copyright Act of 1909, § 1(a), ch. 320, 35 Stat. 1075............................................31

Copyright Act of 1909, § 41, ch. 320, 35 Stat. 1075 ..............................................29

# TABLE OF AUTHORITIES
## (continued)

**Page**

RULES

Federal Rules of Appellate Procedure 26.1 ................................................................1

Federal Rules of Appellate Procedure 32(a)(7)(C)...................................................46

OTHER AUTHORITIES

2 Melville B. Nimmer & David Nimmer,
*Nimmer on Copyright* § 8.11[A] & [B] (2012) ....................................................31

27A Am. Jur. 2d Equity § 89 (2008) .......................................................43

144 Cong. Rec. E2136 (daily ed. Oct. 12, 1998)....................................................23

Dan L. Burk, *Anticircumvention Misuse*,
50 UCLA L. Rev. 1095, 1133 (2003)...................................................19

David Nimmer, *Copyright Law and the Restoration of Beauty*,
47 Osgoode Hall L. J. 553, 561-63 (2009) ....................................................28, 29

H.R. Rep. No. 94-1476 (1976),
*reprinted in* 1976 U.S.C.C.A.N. 5659 ...........................................................38

John T. Cross & Peter K. Yu, *Competition Law and Copyright Misuse*,
56 Drake L. Rev. 427, 457 (2008) ...................................................20

U.S. Constitution, Article I, Section 8, clause 8 ....................................................15

## JURISDICTIONAL STATEMENT

Costco Wholesale Corporation ("Costco") agrees with Omega S.A.'s ("Omega") jurisdictional statement.

## COUNTER-STATEMENT OF ISSUES PRESENTED

Costco, the operator of membership warehouse clubs, purchased and resold Omega watches, without restriction by Omega, for many years.

In 2003, Omega launched a plan to use copyright law to prevent retailers it deems "unauthorized," such as Costco, from selling Omega's then-best selling wristwatch, the Seamaster Model 2531.80 (the "Seamaster"). The Seamaster watch, which Omega has manufactured in Switzerland since 1948, has an obvious utilitarian function. It is not therefore itself subject to the protections of copyright.

As part of its plan to restrict distribution, Omega designed and obtained a United States copyright registration for the "Omega Globe Design" (the "Omega Globe") and placed a miniscule engraved version, measuring only one-eighth of an inch in diameter, on the back of its Seamaster watch. This drawing depicts the Omega Globe in its actual size:



Because it is engraved, the version on the back of the watch is more difficult to see than the version depicted in print above.

The Omega Globe serves no aesthetic purpose. To the contrary, Omega expressly admitted that the purpose of the Omega Globe "was to prevent unauthorized dealership" in the watches to which it was affixed, and to "stem the tide of the gray market." To effectuate its plan, Omega did not market, advertise, publicize or promote the Omega Globe in any way before it filed this action for copyright infringement.

Unaware of the Omega Globe's existence, Costco, as it had done for years, continued to purchase and sell Seamaster watches, even after Omega's use of the Omega Globe. Omega then sued Costco for copyright infringement, asserting that its exclusive right under the Copyright Act, 17 U.S.C. §§ 101 et seq. (the "Copyright Act" or the "Act") to control and limit distribution of the copyrightable Omega Globe enabled it to prohibit importation and distribution of the entire Seamaster watches themselves.

The District Court granted Costco summary judgment on its affirmative defense of copyright misuse, stating that Omega had misused its copyright by leveraging its limited monopoly — its copyright in the Omega Globe — to control the importation and distribution of uncopyrightable Seamaster watches.

This appeal from the order granting summary judgment in favor of Costco presents the following issue:

Was the District Court's grant of summary judgment on Costco's

affirmative defense of copyright misuse appropriate where Omega created, copyrighted and engraved a tiny insignia on the back of its watches, not to serve any expressive or aesthetic purpose, but solely to control the importation and subsequent sale of the uncopyrightable watches to which it was affixed?

## COUNTER-STATEMENT OF THE CASE

Omega filed this copyright infringement action against Costco on July 14, 2004, alleging that Costco had infringed Omega's copyright in the Omega Globe by selling Seamaster watches that had been imported to the United States without Omega's permission. (2 ER 30)

On July 25, 2006, Costco filed its answer to Omega's First Amended Complaint. (2 ER 77) The Eleventh Affirmative Defense alleged copyright misuse. (2 ER 84) On August 16, 2006, Omega filed a motion to strike Costco's misuse defense. (2 ER 88) The motion was denied as moot when the District Court granted summary judgment in Costco's favor on its first sale defense on February 6, 2007. (1 ER 26-27) After this Court reversed the District Court's order granting summary judgment, Omega renewed its motion to strike the affirmative defense of copyright misuse on July 13, 2009. (3 ER 371 [D.E. # 297]). The District Court denied Omega's motion on August 12, 2009. (1 ER 28) The District Court also, *sua sponte*, vacated a previous order denying Costco's

motion for leave to amend its answer to assert copyright misuse and additional affirmative defenses. (*Id.*)

As noted, in 2006, the parties filed cross-motions for summary judgment. The District Court granted summary judgment in favor of Costco based on Costco's first sale defense. (1 ER 26-27) The basis for that defense was that, because Omega had made an authorized first sale of its watches, it could not use the Omega Globe to control further distribution of the watches. In 2008, this Court reversed. 541 F.3d 982. Neither the parties' briefs nor this Court's opinion addressed Costco's separate copyright misuse defense.

The United States Supreme Court granted certiorari, 130 S. Ct. 2089 (2010). On December 13, 2010, the Supreme Court, by an equally divided court, affirmed this Court's ruling, returning the case to the District Court for further proceedings. 131 S. Ct. 565.

On remand to the District Court, Costco and Omega filed cross-motions for summary judgment on Costco's copyright misuse defense. (2 ER 141, 167) On November 9, 2011, the District Court granted Costco's motion and denied Omega's motion, holding that Omega misused its copyright in the Omega Globe by "leveraging its limited monopoly in being able to control the importation of [the Omega Globe] to control the importation of its Seamaster watches." (1 ER 3) The District Court correctly observed that prior decisions recognizing copyright misuse

as an affirmative defense "chose a broad rule for copyright misuse so that the rule could be applied to new situations as they arose," and that Omega should not be allowed to use "the defensive shield of copyright law as an offensive sword." (1 ER 2, 3) Omega now appeals the District Court's order.

On June 20, 2012, after Omega filed its brief in this appeal, the District Court granted Costco's motion for attorney's fees in the amount of $396,844.17. The District Court stated that by affixing "a barely perceptible copyrighted design to the back of some of its watches, Omega did not provide . . . creative works to the public. Omega sought to exert . . . control which it believed it could not otherwise exert . . . . [I]t should have been clear to Omega that its actions were not condoned or protected by copyright law." *Omega S.A. v. Costco Wholesale Corp.*, CV 04-05443, slip op. at 2 (C.D. Cal. Jun. 20, 2012). (1 SER 53-54)

## COUNTER-STATEMENT OF FACTS

Omega manufactures watches in Switzerland and sells them internationally through subsidiaries and authorized distributors located throughout the world. (1 ER 9; 3 ER 310) Costco operates membership warehouse clubs in the United States, and sells brand-name merchandise, including fine watches, to its members at lower prices than are available through its competitors. (1 SER 4) As an example, when this lawsuit was filed in 2004, Omega's suggested retail price for

the Omega "Seamaster" watch at issue was $1,995. (2 SER 122) Costco sold the watch for $1,299. (2 SER 69)

In addition to low prices, Costco offers a generous customer satisfaction policy: if any watch purchased by a Costco member requires service, or if the member is dissatisfied with his or her purchase at any time and for any reason, Costco will repair the watch or refund the member's money. (2 SER 123) This unconditional guarantee is broader and more comprehensive than the warranty provided by Omega, which is limited to defects and to three years. (2 SER 125)

For many years and with Omega's knowledge, Costco sold Omega watches at its warehouse stores. Although Omega never designated Costco as an "authorized" dealer of Omega watches, it did not impose any restrictions as to whom retailers or the customers of retailers could resell watches. (2 SER 246-48, 254-55) Additionally, with the exception of three distributors, Omega had no written sales contracts with any of its hundreds of distributors and retailers worldwide. (2 SER 250-53) Before filing this lawsuit, Omega took no legal action against Costco because Omega knew it was not unlawful for Costco to resell genuine Omega watches. (2 SER 149-50)

In 2003, Omega's legal department devised a plan to try to prevent retailers such as Costco from selling Omega's watches. (2 SER 134, 156-65, 170-71; 2 SER 183-84) A key part of that plan was the Omega Globe, which consists of

curves resembling lines of longitude and latitude on a globe and several Greek "Omega" letters and stars inside a circle. (2 SER 175)

After Omega obtained a United States copyright registration,[1] it placed a small engraving of the Omega Globe, approximately one-eighth inch in diameter, on the back of its then-best selling watch, the Seamaster Model 2531.80. (2 ER 230-31; 3 ER 312; 2 SER 68) There is no dispute that the Seamaster watch itself, which Omega has manufactured since 1948, is not entitled to the protections of copyright and that the Omega Globe was not included on that watch until 2003. (2 SER 218; 2 SER 230-31)

The Omega Globe is unlike previous designs that Omega has engraved on its watches, such as the "Seahorse" and the "Observatory." The Omega Globe and the Seahorse, as they appear in their actual sizes on the back of the Seamaster watch, are reproduced below:



Seahorse ———                                    ——— Omega Globe

---

[1] Omega's application for registration to the United States Copyright Office depicts the Omega Globe as approximately 3.5 inches in diameter, compared to its actual size of one-eighth inch when engraved on the back of the Seamaster watch. (2 SER 186) The application does not indicate that the depiction was some thirty (30) times larger in diameter than as Omega intended it to be used.

(2 SER 175)

The Seahorse and the Observatory are large designs that Omega widely publicized as a method to communicate luxury and value to its customers. By contrast, the Omega Globe was intentionally kept confidential from all outsiders, including Omega's own distributors and consumers. (2 SER 104-07, 111-14) Omega did not market, advertise, publicize or promote the Omega Globe in any way before it filed this action, and made a conscious decision not to do so. (2 SER 91-92; 104-07, 111-14)

Also undisputed is that Omega engraved the Omega Globe on the back of the Seamaster specifically for the purpose of controlling the importation of Omega watches. Yann Gamard, the highest ranking representative of Omega subsidiary Swatch Group (U.S.) Inc., admitted that Omega's legal department proposed creating a copyrighted work and using it to "enable [Omega] to protect the imports and have a better control on . . . distribution." (2 SER 132-34, 153-65) The purpose of the Omega Globe "was to prevent unauthorized dealership." He testified to no other purpose:

> Q.     And, in fact, that was the whole purpose of creating the copyrighted design in the first place?
>
> A.     Well, yes. The purpose was to – to – to prevent unauthorized – unauthorized dealership, yes. Yes. Yes. *Of course*.

(2 SER 170-71) (emphasis added). There were no internal discussions in 2003 about placing the Omega Globe on the front of the watch. (2 SER 117)

In a series of "Gray Market Update" letters to its distributors beginning in April 2009, Omega admitted that it was using the Omega Globe and this lawsuit "as a vehicle to stop the gray market" and to "protect authorized dealers." (2 SER 183-84; 2 SER 185) None of the update letters referred to or commented on any aesthetic or expressive aspect of the Omega Globe.

In 2004, Costco purchased several models of Omega watches, including 117 Seamaster watches on the backs of which the Omega Globe was engraved. (2 SER 68) Although these watches were imported, Costco did not import them. Rather, it purchased them from a company called ENE Ltd. in New York, which had obtained the goods from one of its suppliers also located in New York. (2 SER 68; 2 SER 177-80) Costco was unaware of the existence of the Omega Globe at the time, and sold 43 of these imported watches to its members during 2004. (2 SER 68) On July 14, 2004, Omega sued Costco for copyright infringement. (2 ER 30)

## SUMMARY OF THE ARGUMENT

Omega's use of its copyright in the Omega Globe for the admitted express purpose of prohibiting sale of watches by Costco and other retailers in competition with Omega's "authorized" dealers is copyright misuse. The record is undisputed

that Omega's only goal in developing and affixing its minuscule Omega Globe to the back of its Seamaster watches — consumer goods that are not themselves protected by copyright — was to block sales that it regarded as unauthorized. Omega's conduct, including this litigation, has had nothing to do with protecting any legitimate copyright interest in the Omega Globe.

Copyright law's purpose is to grant valuable, enforceable rights to authors, not as an end in itself, but "to afford greater encouragement to the production of literary works of lasting benefit to the world." *Washingtonian Publ'g Co. v. Pearson*, 306 U.S. 30, 36 (1939) (citation omitted). The copyright misuse defense, first articulated in *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 978 (4th Cir. 1990), applies where "the copyright is being used in a manner violative of the public policy embodied in the grant of a copyright."

The misuse defense is a flexible and broad equitable doctrine, and its contours are still evolving. *See MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 941 (9th Cir. 2010) ("the contours of [the copyright misuse doctrine] are still being defined"). This Circuit, and others, have held that it is misuse for a copyright owner to assert its rights in an anticompetitive manner, such as to exercise control outside the scope of copyright, or otherwise to utilize its copyright in a manner contrary to the policies of copyright law. *See Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1157 (9th Cir. 2011) (quoting *A&M Records, Inc. v.*

*Napster*, 239 F.3d 1004, 1026-27 (9th Cir. 2001) (misuse doctrine prevents copyright holders "from leveraging their limited monopoly to allow them control of areas outside the monopoly")), *cert. denied*, 132 S. Ct. 2374 (2012); *Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 520-21 (9th Cir. 1997) (misuse for a copyright owner to restrict competition by conditioning a copyright license on licensee's promise not to use competitors' products); *Lasercomb*, 911 F.2d at 979 (misuse for a copyright owner to use copyright in software to prevent others from developing competing software).

Omega's conduct may be unique, but it falls well within the doctrine of copyright misuse. Omega plainly had no expressive or aesthetic purpose in adopting and using the Omega Globe. It in no way advanced the purposes of the copyright law — to encourage the creation, dissemination and enjoyment of copyrighted works. *See Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975) ("the ultimate aim [of the Copyright Act] is . . . to stimulate artistic creativity for the general public good"). Omega's goal was plain and simple: to stifle competition by using copyright to control uncopyrightable watches. *See Apple*, 658 F.3d at 1159 (copyright misuse doctrine "prevent[s] copyright holders from using . . . conditions to stifle competition").

Omega's claim of copyright in this case is contrary to one of the most fundamental tenets of copyright law, that ownership of a copyright in an intangible

work is distinct from ownership over physical property to which a copyrighted work is affixed.  *See* 17 U.S.C. § 202.  It also is antithetical to the purposes for which the Section 106(3) right of distribution was enacted — to enable copyright owners to control their rights in a creative work and not, for reasons unrelated to the work, to give them rights to prohibit the distribution of the physical objects to which the work is affixed.

The use of the Omega Globe, which was created at the instance of Omega's internal legal department and enforced by its outside counsel, without any efforts to publicize or exploit the work itself, constitutes misuse.  The District Court correctly concluded that "Omega used the defensive shield of copyright law as an offensive sword" in an improper attempt to leverage its Omega Globe to control the importation and distribution of otherwise uncopyrightable watches.  *Omega S.A. v. Costco Wholesale Corp.*, CV 04-05443, slip op. at 2 (C.D. Cal. Nov. 9, 2011) ("*Order*") (1 ER 2).

Condoning Omega's misuse would have two immediate adverse consequences.  First, it would create a "mutant" species of trademark law, a result the Supreme Court warned against in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 34 (2003), when it was faced with an effort to use trademark law to protect a product for which the copyright had expired.  Because trademark law itself does not allow Omega to control its distribution of its Seamaster

watches, Omega is improperly relying on copyright to do so, the type of practice that the Supreme Court has condemned.

Second, it would give a green light to other U.S. manufacturers hoping to control the gray market and parallel importation. They could block the importation and distribution of their ordinary, uncopyrightable consumer goods by the simple means of manufacturing abroad and affixing tiny, hidden copyrighted symbols to their products. Enabling manufacturers to use copyright to control the importation of any product that incidentally includes or incorporates a copyrighted work would vastly extend the reach of federal copyright law.

As for Omega's other defenses to its conduct, neither *Mazer v. Stein*, 347 U.S. 201, 218-19 (1954), nor 17 U.S.C. § 113(a) applies. Both deal solely with the unremarkable proposition that a work is eligible for copyright protection notwithstanding its incorporation into a useful article. Costco, however, is not contesting the copyrightability of the Omega Globe. Rather, Omega's attempted use of the copyright in this case goes too far. Omega's conduct in placing the Omega Globe on its watches and filing this lawsuit was not designed to vindicate any expressive value in the Omega Globe, but was, instead, used to control the distribution of uncopyrighted consumer goods.

Omega also is incorrect to argue that the District Court somehow acted improperly in evaluating or disapproving Omega's subjective intent and its

motives in using the Omega Globe to control importation and distribution of Seamaster watches. Weighing all relevant facts, including a plaintiff's motives and purposes, is essential for a court that, sitting in equity, is called upon to evaluate the defense of misuse. Even leaving Omega's motives aside, however, its objective conduct — seeking to use a miniscule, hidden, unpublicized design to block the competitive sale of ordinary consumer products, and for no purpose related to the copyright law — is misuse.

The District Court was correct in granting Costco's motion for summary judgment, and denying Omega's motion for partial summary judgment, on Costco's defense of copyright misuse. This Court should affirm that decision.

## ARGUMENT

## I. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT IN FAVOR OF COSTCO ON THE AFFIRMATIVE DEFENSE OF COPYRIGHT MISUSE

### A. The Purpose Of The Copyright Act Is To Enrich The Culture By Encouraging The Production Of Creative Works.

Omega engaged in misuse of its copyright because it used the Omega Globe solely for the purpose of restricting the distribution of its Seamaster watches. That had nothing whatsoever to do with the purpose of the copyright law, which is to grant valuable, enforceable rights to authors, not as an end in itself, but "to afford greater encouragement to the production of literary works of lasting benefit to the world." *Washingtonian Publ'g. Co. v. Pearson*, 306 U.S. 30, 36 (1939) (citation

omitted).  *See also Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932) ("sole

interest of the United States and the primary object in conferring [copyrights] lie in

the general benefits derived by the public from the labors of authors").

This philosophy flows directly from Article I, Section 8, clause 8 of the

United States Constitution, which gives Congress the power "[t]o promote the . . .

useful Arts" by granting, for limiting times, "Authors . . . the exclusive Right to

their respective Writings."  The reward given to an author, however, in the form of

exclusive copyright rights is a "secondary consideration" designed to "induce

release to the public of the products of his creative genius."  *United States v.*

*Paramount Pictures, Inc*., 334 U.S. 131, 158 (1948).  "[T]he reward does not serve

its public purpose if it is not related to the quality of the copyright."  *Id*.  *See also*

*Harper & Row, Pubs., Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985) (copyright

law furthers constitutional goals by establishing a "marketable right to the use of

one's expression" in order to supply "the economic incentive to create").

**B.** **The Use Of A Copyright Contrary To The Purposes Of The Act Constitutes Copyright Misuse.**

The Omega Globe, and Omega's lawsuit against Costco, are completely

unrelated to any of these constitutional purposes.  Omega did not use the Omega

Globe to protect any purported expressive or aesthetic value in its drawing.

Rather, Omega affixed the Omega Globe to the back of its Seamaster watches

solely to block sales outside its restrictive, high-priced distribution system. Omega admitted as much in a series of "Gray Market Update" letters in which it stated that the Costco lawsuit was "filed to stop its unauthorized importation of *Omega watches* into the U.S." (emphasis added). (2 SER 185)

This admittedly anti-competitive goal, unrelated to any legitimate copyright purpose, is well within the doctrine of misuse, as developed and applied in this and other Circuits to copyright claims. Copyright misuse applies where "the copyright is being used in a manner violative of the public policy embodied in the grant of a copyright." *See Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 978 (4th Cir. 1990). As *Lasercomb* recognized, the misuse doctrine ensures that the constitutional principles underlying copyright protection are not subverted:

> The grant to the [author] of the special privilege of a [copyright] carries out a public policy adopted by the Constitution and laws of the United States, "to promote the Progress of Science and useful Arts, by securing for limited Times to [Authors] ... the exclusive Right ..." to their ["original" works]. But the public policy which includes [original works] within the granted monopoly excludes from it all that is not embraced in the [original expression]. It equally forbids the use of the [copyright] to secure an exclusive right or limited monopoly not granted by the [Copyright] Office and which it is contrary to public policy to grant.

*Lasercomb*, 911 F.2d at 977 (quoting *Morton Salt Co. v. G.S. Suppiger Co.*, 314 U.S. 488, 492 (1942) (quoting United States Constitution, Art. I, § 8, cl. 8)).

Omega argues that the copyright misuse doctrine has been "restricted" to a limited set of circumstances. (Omega Br. 19). This is incorrect. Misuse is uniformly recognized as an affirmative, equitable defense to copyright infringement in a wide range of circumstances.[2] Courts "deliberately chose a broad rule for copyright misuse so that the rule could be applied to new situations as they arose." *Order,* at 3 (1 ER 3). As this Court has put it, copyright misuse is an evolving concept, the outer boundaries of which have yet to be fully defined. *See MDY Indus., LLC v. Blizzard Entm't,* 629 F.3d 928, 941 (9th Cir. 2010).[3]

The doctrine of "misuse" is flexible, a function of its equitable roots. *See In re Napster, Inc. Copyright Litig.*, 191 F. Supp. 2d 1087, 1102 (N.D. Cal. 2002) (doctrine is flexible, and "finds its origins in the equitable defense of unclean hands"). As this Court has noted, it "derive[s] from the long-standing existence of

---

[2] *Cf. Ticketmaster LLC v. RMG Techs., Inc*., 536 F. Supp. 2d 1191, 1199 (C.D. Cal. 2008) (recognizing copyright misuse as an affirmative defense; considering whether it could be an affirmative claim in some contexts).

[3] In the District Court, Omega argued that the doctrine is limited to violations of the antitrust laws. That, too, was incorrect. This Court and all four of the other Circuits to have addressed the issue have held that copyright misuse does not require a violation of the antitrust law. *E.g.*, *Practice Mgmt. Info. Corp. v. Am. Med. Ass'n,* 121 F.3d 516, 521 (9th Cir. 1997) (agree with Fourth Circuit that defendant in a copyright infringement suit "need not prove an antitrust violation to prevail on a copyright misuse defense") (citing *Lasercomb*, 911 F.2d at 978)); *Alcatel USA, Inc. v. DGI Techs, Inc*., 166 F. 3d 772, 784, 792-93 (5th Cir. 1999); *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc*., 342 F.3d 191, 204-06 (3d Cir. 2003); *Assessment Techs. of WI, LLC v. WIREdata, Inc*., 350 F.3d 640, 647 (7th Cir. 2003). Omega now has apparently abandoned that argument.

such a defense in patent litigation." *Apple v. Psystar*, 658 F.3d 1150, 1157 (9th Cir. 2011), *cert. denied*, 132 S. Ct. 2374 (2012). When it was first applied by the Supreme Court in that context, the Court held that where a

> patent is used as a means of restraining competition with the patentee's sale of an unpatented product . . . [e]quity may rightly withhold its assistance from such a use of the patent by declining to entertain a suit for infringement [until] the improper practice has been abandoned and [the] consequences of the misuse of the patent have been dissipated.

*Morton Salt*, 314 U.S. at 493, quoted *in Apple*, 658 F. 3d at 1157.

One of the reasons the doctrine is flexible is that, as with all equitable concepts, it must deal with new factual situations. *See Holland v. Florida*, 130 S. Ct. 2549, 2563 (2010) ("flexibility inherent in equitable procedure enables courts to meet new situations [that] demand equitable intervention, and to accord all the relief necessary to correct . . . particular injustices" (citation and internal quotation marks omitted)); *see also Video Pipeline*, 342 F.3d at 204-06 (copyright misuse not limited to anticompetitive concerns but is, instead, rooted in "copyright's policy goal to encourage the creation and dissemination to the public of creative activity"). That other product manufacturers have not engaged in the same conduct as Omega or had their attempts to use copyright to control the importation or distribution of products challenged as misuse says nothing about whether, in the context of this case, the District Court's conclusion was correct.

In fact, the use of an intellectual property right in ways unrelated to the purpose for which patents and copyrights are granted has been at the core of "misuse" from the outset. When the Fourth Circuit, building on *Morton Salt,* first applied the concept, it held copyright misuse exists when "the copyright is being used in a manner violative of the public policy embodied in the grant of a copyright." *Lasercomb,* 911 F.2d at 978. In *Lasercomb*, the court found that plaintiff misused its copyright in a software program by improperly attempting to use the copyright in a particular expression [that software] to control competition in "the idea of computer-assisted die manufacture." *Id.*

In *Practice Mgmt. Info.*, this Court held that it was misuse for a copyright owner to use a license to prohibit its licensee from using the copyright owner's "competitors' products," and that "[b]y agreeing to license the CPT in this manner, the AMA used its copyright 'in a manner violative of the public policy embodied in the grant of a copyright.'" *See Practice Mgmt. Info.*, 121 F.3d at 521 (quoting *Lasercomb*, 911 F.2d at 977). That is consistent with the overall theme of misuse, which is a "refusal to reward private extension of intellectual property rights contrary to public policy; not simply to ward off antitrust violations, or even to prevent economically anticompetitive activity." Dan L. Burk, *Anticircumvention*

*Misuse*, 50 UCLA L. Rev. 1095, 1133 (2003);[4] *see also Religious Tech. Ctr. v. Lerma*, Civ A. No. 95-1107-A, 1996 WL 633131, at *12 (E.D. Va. Oct. 4, 1996) (misuse where copyrights are asserted "in an improper or offensive manner not intended by the copyright law[]"); *QAD Inc. v. ALN Assocs., Inc.,* 770 F. Supp. 1261, 1270 (N.D. Ill. 1991), *aff'd*, 974 F.2d 834 (7th Cir. 1992) (court "should not and will not offer its aid to a copyright holder whose actions run contrary to the purpose of the copyright itself").

### C.  Omega's Conduct Falls Clearly Within The Copyright Misuse Doctrine.

The record below is clear that Omega tried to leverage its copyright in its tiny Omega Globe, placing it on the back of its Seamaster watches, not for its aesthetic or expressive qualities, but for the express purpose of giving Omega the ability to control the importation and distribution of the watches to which it was affixed.  That conduct, however unique, is at the core of the misuse doctrine.

The District Court's holding is entirely consistent with a line of copyright cases finding misuse where a copyright owner seeks to use its copyright to exercise control over physical products or uncopyrightable data in contravention of the

---

[4] Other commentators are in accord.  *See e.g.*, John T. Cross & Peter K. Yu, *Competition Law and Copyright Misuse*, 56 Drake L. Rev. 427, 457 (2008) ("Thus, in theory, *any act* by which a copyright owner attempts to expand its rights beyond the limits imposed by the Copyright Act could constitute misuse." (emphasis added)).

purpose underlying copyright law.  In *Alcatel USA*, for example, the Fifth Circuit, in the context of endorsing a jury instruction, recognized that misuse may be present where the licensor had "used its copyrights to indirectly gain commercial control over *products [it] does not have copyrighted*."  *Alcatel USA*, 166 F.3d at 793 (emphasis added).  There, the licensor had sought to obtain a "limited monopoly over its uncopyrighted microprocessor cards."  *Id*. at 794.  Because that was misuse, the Fifth Circuit concluded the district court had abused its discretion in granting injunctive relief based on the defendant's infringing acts.

In *Assessment Techs.*, the Seventh Circuit found "appalling" efforts by the owner of copyrighted software to leverage its copyright to block access to data that were neither copyrighted nor copyrightable.  *See Assessment Techs.*, 350 F.3d at 641-42 ("It would be appalling if such an attempt could succeed.").  Collecting and applying the leading cases in the area of copyright misuse, including this Circuit's decisions in *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1026-27 (9th Cir. 2001), and *Practice Mgmt. Info.,* as well as *Alcatel USA* and *Lasercomb*, Judge Posner, writing for the court, stated that misuse "prevents copyright holders from leveraging their limited monopoly to allow them control of areas outside the monopoly."  *Assessment Techs.*, 350 F.3d at 647 (quoting *A&M Records*, 239 F.3d at 1026-27).

Nothing in *Assessment Techs.* suggests, as Omega would have it, that the copyright misuse doctrine can only be applied in situations involving a license or other contractual relationship. (Omega Br. 14) Moreover, even in a case such as *Assessment Techs.,* where the software and the uncopyrightable data were so "entangled" that the data could "not be extracted without making a copy of the program," the court acknowledged that it could be misuse to control the uncopyrightable elements. *Id*. at 644-45. The Seventh Circuit stated, in language that applies with particular force here, that misuse might be present where a copyright owner sought "to use an infringement suit to obtain *property protection*" — over data — "that copyright law clearly does not confer . . . ." *Id*. (emphasis added) (denying plaintiff relief, without expressly holding that plaintiff had engaged in copyright misuse). Such a suit would be, the court wrote, "an abuse of process." *Id*. No less abusive here is Omega's practice of "entangling" the Omega Globe with the Seamaster watches to which it is affixed, hoping to gain what otherwise would be unobtainable control over their distribution.

This Court's most recent copyright misuse decision, *Apple*, draws a clear and principled distinction between proper and improper assertions of copyright rights. *Apple* held it was not copyright misuse for a license to bar use of Apple's own software on non-Apple computers, where the purpose of the license was "to prevent infringement and control use of the copyrighted material." *Apple*, 658

F.3d at 1155. Those purposes are a "legitimate exercise" of the copyright owner's "right to conditionally transfer works of authorship." *Id*. at 1160. By contrast, where a copyright owner is not bringing a copyright claim for the purposes of preventing infringement or controlling the use or transfer of its "works of authorship," but is, instead, asserting its rights under copyright to limit competition in a physical product, that is misuse. *See id.* at 1159, 1160 (copyright misuse doctrine "prevent[s] copyright holders from using [] conditions to stifle competition"). Here, Omega is exercising its copyright for the express purpose of doing just that.[5]

Further underscoring the extent to which Omega's activities constitute misuse, because they are unrelated to furthering a copyright-related interest, are two decisions applying the "paracopyright" regime[6] established by the Digital Millennium Copyright Act, 17 U.S.C. §§ 1201 et seq. (the "DMCA"). *See Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178 (Fed. Cir. 2004);

---

[5] Omega argues that because "Costco remains free to sell its own watches," (Omega Br. 14), Omega's actions do not preclude competition and, therefore, do not constitute misuse. That Costco may sell its own watches is beside the point; Omega's use of the Omega Globe to prevent Costco from selling genuine Omega watches precludes Costco from competing with Omega and its designated "authorized" dealers on price, warranty and other terms of interest to consumers.

[6] *See* 144 Cong. Rec. E2136, 2137 (daily ed. Oct. 12, 1998) (statement of Rep. Bliley) (noting that "distinguished law professors" had referred to DMCA bill as a "paracopyright" measure).

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522 (6th Cir. 2004). Section 1201(a) of the DMCA prohibits circumvention of technological measures used to protect access to a copyrighted work. Both *Chamberlain Grp.* and *Lexmark* rejected copyright owners' attempts to leverage copyrighted works that were incidental to, but embedded within, products for the purpose of precluding competition in otherwise uncopyrightable consumer goods.

In *Chamberlain Group*, the Federal Circuit refused to allow the manufacturer of a garage door opener to use the DMCA to prohibit the sale of defendant's universal transmitter. Defendant's product bypassed a security feature that protected the copyrighted software in plaintiff's garage door opener. *See Chamberlain Grp.,* 381 F.3d at 1185. In rejecting the DMCA claim, the court recognized that the statute ought not to prohibit competition in common consumer goods. It stated that under the plaintiff's construction of the DMCA, the manufacturer of any product would be allowed "to add a single copyrighted sentence or software fragment to its product, wrap the copyrighted material in a trivial 'encryption' scheme, and thereby gain the right to restrict consumers' rights . . . ." *Id.* at 1201.

Similarly, in *Lexmark*, the Sixth Circuit rejected an attempt by the manufacturer of printer toner cartridges to use the DMCA to bar competitive manufacturers. Lexmark, the plaintiff, had embedded a microchip in its toner

cartridges and used an authentication sequence to ensure that only Lexmark toner cartridges could be used with its printers. *See Lexmark*, 387 F.3d at 530. Lexmark brought a Section 1201(a) DMCA claim against the defendant, which manufactured a computer chip that could satisfy that authentication sequence and embedded it in toner cartridges. In rejecting Lexmark's claim that the defendant violated the DMCA, the court stated that the DMCA's purpose was not to prevent consumers from having access to consumer products. "Nowhere . . . did Congress express an interest in creating liability for the circumvention of technological measures designed to prevent consumers from using consumer goods . . . ." *Id.* at 549.[7]

The holdings of *Chamberlain Grp.* and *Lexmark*, that neither copyright nor the DMCA can be used to protect consumer goods, apply here. The Omega Globe was not used in any expressive or aesthetic manner, but is akin to the "trivial encryption scheme" in *Chamberlain Group*. It is a misuse of copyright to allow Omega to use the Omega Globe to shield the uncopyrightable watches from competition.

---

[7] *See also id.* (citing "Anti-Circumvention Rulemaking Hearing, at 44-56, *available at* http://copyright.gov/1201/2003/hearings/transcript-may9.pdf (testimony of Professor Jane Ginsburg) (Section 1201(a) does not 'cover[] the circumvention of a technological measure that controls access to a work not protected under [the Copyright] title. And if we're talking about ball point pen cartridges, printer cartridges, garage doors and so forth, we're talking about works not protected under this title.') [at 46]").

### D. Omega's Conduct Does Not Advance The Goals Of Copyright.

The record below is unequivocal. Omega developed and affixed the Omega Globe to the back of its Seamaster watches, and brought this suit, for reasons completely unrelated to the public policy underpinnings of copyright law.

Omega's strategy of first creating the Omega Globe, then affixing it to uncopyrightable products so it could file an infringement action, has nothing to do with enriching culture, furthering artistic creativity or nurturing new expressive works. Far from furthering any purpose promoted by copyright, Omega's conduct — based on an admitted desire solely to exercise control over a non-copyrightable product (2 SER 183-84; 2 SER 185) — is directly contrary to such purposes.

Omega did not create the Omega Globe for any aesthetic or creative purpose. Instead, Omega made the Omega Globe a barely-perceptible half centimeter in diameter and hid it on the back of the Seamaster watch. The company's highest-ranking U.S. representative expressly admitted that the design was created to control importation, and that he had not even seen the so-called "artwork" used to achieve this goal prior to his deposition. (2 SER 132-34, 153-65) Omega never intended for its copyrighted work to have any expressive purpose, including to enrich the culture, but, instead, only to "prevent unauthorized dealership":

> Q. And, in fact, that was the whole purpose of creating the copyrighted design in the first place?

A.     Well, yes. The purpose was to – to – to prevent unauthorized – unauthorized dealership, yes.  Yes.  Yes. ***Of course***.

(2 SER 170-71) (emphasis added).

In addition to Omega's unequivocal admission on this point, other facts of record show that Omega does not seek to market or exploit or control any aesthetic or expressive aspect of the Omega Globe.  The expression that the Omega Globe embodies or conveys has little, if any, value on its own:  1) it is barely perceptible (2 SER 175); 2) it is largely hidden, being placed on the back of the Seamaster watch, *id.*; 3) it was implemented without publicity (2 SER 104-07, 111-14); and 4) the watch was sold for decades without it.  (2 SER 218; 2 SER 230-31)

Copyright holders typically produce, obtain copyrights on, reproduce and distribute creative designs and embody them in articles so that consumers will see the aesthetic, expressive or creative elements and purchase the good.  Here, however, Omega did not want its consumers — or even its own retailers responsible for selling the watch — to even know that the Omega Globe existed. (2 SER 104-07, 111-14)  The Omega Globe never affected any decision of any of Costco's members to purchase Omega watches, because they knew nothing about it.

Unlike a creative or expressive work protected by copyright, Omega has never licensed the Omega Globe apart from the Seamaster watch, whether affixed

to a physical product or otherwise; Omega does not earn any independent revenues from the Omega Globe, nor has Omega used it as a logo or marketing aid to help sell any of the Seamaster watches to which it is affixed.[8] (2 SER 262) It is, therefore, difficult to imagine any sense in which the Omega Globe "symboliz[es] artistic value and luxury to customers." (Omega Br. 10) The record demonstrates that Omega uses the Omega Globe solely as a vehicle to enable Omega to control competition in the distribution of Seamaster watches.[9]

"[P]eople buy books to read them, rent movies to view them, and stream songs to listen to them." David Nimmer, *Copyright Law and the Restoration of*

---

[8] Unlike the much larger and more visible "Seahorse" and "Observatory" logos that Omega has used in the past and publicized, which it claims it has used to "communicate value and luxury to its customers," (Omega Br. 9) the Globe has never been publicized. (2 SER 99-107, 111-14; 2 SER 189-93)

[9] Absent from the record is any evidence that Omega would have the slightest added economic incentive to create different or better or enhanced designs, whether affixed to watches or otherwise, were it able to misuse the distribution right in this way. *Cf. SmithKline Beecham Consumer Healthcare L.P. v. Watson Pharms., Inc.*, 211 F.3d 21, 29 n.5 (2d Cir. 2000) ("the 'danger lurking in copyright protection for labels is that the tail threatens to wag the dog — proprietors at time seize on copyright protection for the label in order to leverage their thin copyright protection over the text . . . on the label into a monopoly on the typically uncopyrightable product to which it is attached'" (quoting 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 2.08[G][2], at 2-138 [(2-136.1 (2012 ed.)])); *Sassafras Enters., Inc. v. Roshco, Inc.*, 889 F. Supp. 343, 345 (N.D. Ill. 1995) (case presents a "familiar scenario: Established concern . . . is threatened in existing market . . . by competitor . . . and responds by filing suit asserting unfair competition and a number of related claims, including copyright infringement of written materials accompanying the product.").

*Beauty*, 47 Osgoode Hall L. J. 553, 561-63 (2009). As to these activities, "copyright acts to protect the expression that the public values, and therefore the core purpose of copyright law is to protect these expressive works." *Id.* Where, however, the copyright owner tries to use its copyright not to make consumers want to purchase the copyrighted work, but, rather, to limit their ability to buy an uncopyrighted product, that crosses the line into copyright misuse.

> **E.      The Undisputed Facts Confirm That Omega Used Its Copyright To Control The Distribution Of A Physical Object That Could Otherwise Be Freely Traded.**

For more than 100 years, a core principle of copyright law has been that a work eligible for copyright is wholly distinct from any object in which the work is embodied. The 1909 Act, the predecessor to the Copyright Act, expressly stated that property rights in a material object are distinct from the copyright itself: "The copyright is distinct from the property in the material object copyrighted. . . ." Copyright Act of 1909, § 41, ch. 320, 35 Stat. 1075, 1084. The current Act puts it this way: "Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied." *See* 17 U.S.C. § 202.

This places an attempt to control property interests in material objects beyond the legitimate scope of any of the rights conferred on a copyright owner by the Copyright Act. In particular, the distribution right, set forth in Section 106(3),

and relied on by Omega below, permits control only of copyrighted works of authorship, not of the physical objects in which they are embodied. The distribution right is concerned with the distribution of a copyrightable work-qua-work, such as the text of a novel. It is not intended to allow a copyright owner to control the distribution of the physical media — the binding, paper and ink — that may embody that novel fixed in a hard copy format.

That makes Omega's admission and its own recitation of the relevant facts, all of which demonstrate that it did not assert its copyright right to protect the Omega Globe but, instead, to control distribution of its watches, dispositive. *See* Omega Br. 10-11. Omega's reliance on the distribution right has nothing to do with the Constitution or the promotion of original works of authorship.[10]

---

[10] For that reason, Omega's contention that, because it has the exclusive right to control the distribution to the public of copies, it cannot be engaged in copyright misuse (*see* Omega Br. 23) misses the point. This appeal does not involve whether Omega has exclusive rights under Section 106(3) for which the first sale doctrine of 17 U.S.C. §109(a) provides a statutory limitation; this court, in a decision affirmed by an equally divided Supreme Court, has already held that Section 109(a) did not apply to Costco's sale of imported Seamaster watches. *See Omega S.A. v. Costco Wholesale Corp.*, 541 F.3d 982 (9th Cir. 2008), *aff'd*, 131 S. Ct. 565 (2010). (Just three months ago, the Supreme Court chose to once again take up the question of whether importers and distributors of products first manufactured abroad are entitled to invoke the first sale doctrine. *See Kirtsaeng v. John Wiley & Sons, Inc.*, 654 F.3d 210 (2d Cir. 2011), *cert. granted*, 80 U.S.L.W. 3365 (Apr. 16, 2012) (No. 11-697).) Accordingly, the first sale doctrine-related cases cited by Omega are irrelevant to this appeal. *See* Omega Br. 25-27 (citing *Parfums Givenchy, Inc. v. Drug Emporium, Inc.*, 38 F.3d 477 (9th Cir. 1994) (copyright claim brought to control importation and distribution); *Denbicare U.S.A., Inc. v. Toys "R" Us, Inc.*, 84 F.3d 1143 (9th Cir. 1996) (first sale doctrine applied in

That the true purpose of the distribution right is not control of physical objects is clear when its lineage is traced. It evolved directly from the right to "publish" a work, first created by the original Copyright Act of 1790. Copyright Act of 1790, § 1, ch. xv, 1 Stat 124, 124. That right was subsequently carried forward into the 1909 Act, which granted copyright owners the exclusive right to "publish" and "vend" a "copyrighted work," language that is focused on the work, not a material object, such as a watch, to which it may be affixed or in which it may be embodied. *See* Copyright Act of 1909, §1(a), ch. 320, 35 Stat. 1075, 1075.

The current Act re-labels the right to "publish" and "vend" the "work" as the right "to distribute,"[11] but it is clear the terms "publication" and "distribution"

---

distribution right claim); *Swatch S.A. v. New City, Inc.*, 454 F. Supp. 2d 1245 (S.D. Fla. 2006) (first sale doctrine applicable to copyrighted work on face of watch did not apply to importation and distribution of watches manufactured and first sold abroad)). None of these cases considered copyright misuse. Likewise, because this Court addressed only the first sale issue in its previous ruling in this case, it did not "tacitly acknowledg[e] that Omega's control over the distribution and importation of Seamaster watches with the engraved Omega Globe was a right Omega expressly enjoys under copyright law" and, therefore, not misuse. (Omega Br. 29) The misuse defense was not raised or addressed in the prior appeal.

[11] The right to "distribute to the public by sale or other transfer of ownership" was first codified in the 1971 law that first afforded federal copyright protection for sound recordings. *See* 1971 Sound Recordings Amendment Act, § 1(a), 85 Stat. 391, 391 (adding subsection (f) to Section 1 of the 1947 Copyright Act). The term "distribution" was first used in early drafts of the general revision bill that culminated in the Copyright Act, with the purpose of eliminating the accretive case law over the term "publication." *See* 2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8.11[A] & [B], pp. 8-148 to 154.4 (Matthew Bender 2012)

remain synonymous. *See Harper & Row, Pubs.*, 471 U.S. at 552 (exclusive

publication right equated with distribution right); *Ford Motor Co. v. Summit Motor

Prods., Inc*., 930 F.2d 277, 299 (3d Cir. 1991) ("publication" and distribution right

"are for all practical purposes, synonymous").  The reason Omega's express

admission as to its purpose is dispositive is that it makes clear Omega was in no

sense engaged in "publishing" its Seamaster watches or any designs engraved on

the back of those watches.  Instead, it is attempting to control the distribution of

those watches for reasons unrelated to the goals of copyright law — and the

purpose of Section 106(3) — which are to enable copyright owners to exploit or

limit access to the copyrighted works themselves.

In sum, nothing about Omega's assertion of its copyright claim here would

further the copyright law's purpose of "motivating creative activity."  *Sony Corp.

of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984) (copyright rights

intended to "motivate the creative activity of authors").

### F.    Omega's View Of Copyright Improperly Extends The Boundaries of Copyright Into The Realm Of Trademark.

Another consequence of Omega's use of the Omega Globe to control the

distribution of its product is that it improperly extends the Copyright Act beyond

its proper bounds into the realm of trademark law.

---

(describing process by which "distribution right" was introduced and came to
replace 1909 Act's "publication" right).

Copyright and trademark law, of course, serve fundamentally different purposes and are motivated by different goals. Unlike copyright, trademark law is not designed to offer the trademark owner an incentive to create. Rather, it is concerned with protecting consumers from confusion and assisting them in differentiating among competing goods or services. *See Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 163-65 (1995). The respective intellectual property regimes and their goals are not interchangeable.

The Supreme Court already has emphasized the importance of hewing to the lines that differentiate distinct intellectual property regimes. *See Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003). In *Dastar*, the plaintiff brought an action under the Lanham Act for reverse passing off, alleging that the defendant had copied and sold videos of a television series for which the plaintiff's copyright had expired. *See id.* at 27-28. The Court therefore was required to examine whether it was proper to assert trademark rights to maintain a monopoly over copyrightable works that were in the public domain. The Court rejected the plaintiff's claim, stating that to allow such a cause of action under the Lanham Act would "create a species of mutant copyright law that limits the public's federal right to copy and to use expired copyright." *Id.* at 34 (citations and internal quotation marks omitted). It emphasized that intellectual property rights are "part of a carefully crafted bargain," and should not be expanded, *id.* at 33 (internal

citation and quotation marks omitted), something it had cautioned against

previously, in *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29

(2001).

Omega is guilty of exactly the conduct the Court has warned against. When

Omega argues that the Omega Globe provides prestige to its Seamaster watch

(Omega Br. 10) — despite that it is tiny, hidden and not publicized — Omega tries

to vindicate what is essentially a trademark interest in the watch. The Omega

Globe, however, conveys no more prestige than a © or ® symbol and cannot create

any "association" with Omega in the eyes of consumers, who do not even know it

is there. It has no secondary meaning and it serves no source-identifying function.

Moreover, as a matter of law, Omega has not brought, and cannot bring, a

claim of trademark infringement against Costco because the Seamaster watches

Costco sold were genuine and "trademark law is designed to prevent sellers from

confusing or deceiving consumers about the origin or make of a product, which

confusion ordinarily does not exist when a genuine article bearing a true mark is

sold." *NEC Elecs. v. CAL Circuit Abco*, 810 F.2d 1506, 1509 (9th Cir. 1987)

(resale of genuine trademark goods, even if unauthorized, cannot constitute

trademark infringement), *citing Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368-69

(1924). After Omega's first sale of the watches, its trademark protections under

the Lanham Act are exhausted. *See Enesco Corp. v. Price/Costco Inc*., 146 F.3d

1083, 1085 (9th Cir. 1998) (resale by "first purchaser of the original article . . . is generally neither trademark infringement nor unfair competition" (citing *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1074 (9th Cir. 1995))).

For these reasons, Omega cannot use trademark law to stop Costco from selling genuine Seamaster watches. Omega may not, however, invoke copyright as a sort of "federal stop gap" to provide it with remedies where the federal Lanham Act does not.

### G. Allowing Omega To Control Importation And Distribution of Products That Are Not Copyrightable Would Have Far-Reaching Consequences Antithetical to Competition.

Omega's conduct also has significant adverse implications. If the copyright in the Omega Globe can be misused in this manner, then any manufacturer producing products abroad could create similar, minuscule copyrighted designs or text of no value and affix them to their products, unbeknownst to distributors and consumers. For example, shoes manufactured abroad for U.S. companies could have minute designs affixed to the bottom of their heels, or inside the shoe, for the sole purpose of enabling control over their importation or distribution. Similarly, a tiny copyrighted symbol could just as easily be hidden on the back of a legal pad, under a table top, or on the back of clothing labels. Such designs and symbols could be the copyright law-sanctioned artifice that U.S. product manufacturers would use to control parallel imports.

Apart from importation, the affixation of copyright designs or the inclusion of functional computer software could be used to control the distribution in the United States of uncopyrightable consumer products that are leased, but not sold. The re-leasing of cars leased by their manufacturers could, for example, be deemed to constitute a violation of Section 106(3) to the extent that the cars incorporate copyrighted software (as today's automobiles do) in their electrical systems. The widespread adoption of Omega's practices would vastly extend the reach of the Copyright Act, enabling copyright owners to restrain alienation of personal property.

### H. Omega's Remaining Arguments Are Unavailing.

Omega argues that *Mazer v. Stein*, 347 U.S. 201 (1954), 17 U.S.C. § 113(a) and miscellaneous cases dealing with copyrightability and the first sale doctrine, all mean that its engraving of the Omega Globe on the Seamaster watch cannot be misuse. (Omega Br. 23-27) That is incorrect. *Mazer* and Section 113(a) speak solely to whether an artistic work remains copyrightable when it is incorporated into an otherwise utilitarian work. That proposition is irrelevant to the question of whether Omega's Section 106(3) claim is copyright misuse.

*Mazer* held that copyrights for statuettes were valid even though they were intended to be used, and were used, as bases for table lamps in addition to standalone statuettes. *See Mazer*, 347 U.S. at 218. In *Mazer*, unlike the facts here,

the statuette was a prominent part of the overall product, ensuring that consumers would value it for its aesthetic features. No consumers, however, would buy the Seamaster watch for the Omega Globe, especially when they were not even informed of its existence.

In any event, that a work is eligible to be copyrighted, notwithstanding its incorporation into a useful article, is beside the point. Copyrightability is an element of plaintiff's *prima facie* case of copyright infringement. It does not affect, one way or another, whether the affirmative defense of copyright misuse applies. *See Practice Mgmt. Info.*, 121 F.3d at 520 n.9 ("Copyright misuse does not invalidate a copyright, but precludes its enforcement during the period of misuse."); *Alcatel USA*, 166 F.3d at 793 n.81 (same). Costco has never asserted that the Omega Globe — notwithstanding its tiny size and improper purpose — is not copyrightable by reason of its affixation to a Seamaster watch or otherwise.[12]

---

[12] Omega also quotes four words from the decision in *Mazer* to the effect that the decision had indicated that there is no "misuse of the copyright" when a copyrighted design is registered and incorporated into a useful article. (Omega Br. 30). That out-of-context reference to the opinion's use of the word "misuse" is misleading because the Court was simply making clear that registration of a work incorporated into a useful article is permitted. *See Mazer*, 347 U.S. at 218-19 ("Nor do we think the *subsequent registration of a work* of art published as an element in a manufactured article, *is a misuse* of the copyright. This is not different from the registration of a statuette and its later embodiment in an industrial article." (emphasis added)). *Mazer* nowhere discusses the copyright misuse doctrine as subsequently adopted in *Lasercomb* and other cases.

Section 113(a) of the Copyright Act does little more than codify *Mazer* and also is inapplicable. It provides only that the exclusive right to "*reproduce*" a work in copies includes the right to do so "in or on any kind of article, whether useful or otherwise," as *Mazer* essentially holds. *See* 17 U.S.C. § 113(a) (emphasis added).[13] Moreover, that section deals only with the right to reproduce a work in copies that may be useful articles. The reproduction right, which is set forth in 17 U.S.C. § 106(1), however, is not involved in this case. Nor does Section 113(a) shed any light on the question of whether a copyright is misused when a work is placed on a useful article expressly to control the importation and distribution of that article, not to advance or exploit any expressive or aesthetic purpose relating to that work.

---

[13] *See also* H.R. Rep. No. 94-1476, at 105 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5720 ("The rule of *Mazer*, as affirmed by the bill, is that *copyright* in a pictorial, graphic, or sculptural work *will not be affected if the work is employed as the design of a useful article*, and will afford protection to the copyright owner against the *unauthorized reproduction* of his work in useful as well as nonuseful articles." (emphasis added)); Staff of H. Judiciary Comm., Register's Report on the General Revision of the U.S. Copyright Law, at 13-15 (Comm. Print 1961) ("[A]s the Supreme Court held in the *Mazer* case, the *protection* now accorded by the copyright statute *should continue to be available for 'works of art'* — that is pictorial, graphic, and sculptural works — even after they have been employed as a *design or decoration of a useful article*." (emphasis added)).

The other cases on which Omega relies are similarly inapplicable. They either address the first sale doctrine[14] or the question of whether a utilitarian object incorporating an artistic work can be copyrightable, or they are otherwise inapposite. *See Quality King Distribs., Inc. v. L'anza Research Int'l*, 523 U.S. 135 (1998) (first sale doctrine applies to round-trip copies); *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224 (11th Cir. 2010) (whether defendant infringed plaintiff's copyright or use was fair); *Denbicare U.S.A. Inc. v. Toys "R" Us, Inc.*, 84 F.3d 1143 (9th Cir. 1996) (whether infringement claim was barred by the first sale doctrine); *Parfums Givenchy, Inc. v. Drug Emporium, Inc.*, 38 F.3d 477 (9th Cir. 1994) (whether infringement claim was barred by the first sale doctrine); *Kieselstein-Cord v. Accessories by Pearl, Inc.*, 632 F.2d 989 (2d Cir. 1980)

---

[14] Demonstrating the distinction between the first sale and misuse arguments, the Solicitor General previously urged the Supreme Court to deny certiorari on the first sale issue, in part on the ground that the case could be adjudicated in the trial court based on Costco's misuse defense:

> Petitioner has challenged, as a misuse of copyright, respondent's artifice of affixing a tiny copyrighted logo to its luxury wristwatches in order to invoke Section 602(a)(1). . . . The "principal function" of copyright law "is the protection of original works, rather than ordinary commercial products that use copyrighted material as a marketing aid." *Quality King*, 523 U.S. at 151. . . . To the extent that the particular type of copyrighted material at issue here raises distinct policy concerns, however, those concerns are best addressed on remand under a legal theory specifically targeted at that alleged abuse.

(2 SER 195-96)

(copyrightability of ornamental belt buckle); *Rosenthal v. Stein*, 205 F.2d 633 (9th Cir. 1953) (copyrightability of design of statuettes; whether copyright was infringed); *Swatch S.A. v. New City, Inc.,* 454 F. Supp. 2d 1245 (S.D. Fla. 2006) (importation of goods manufactured and first sold abroad not barred by first sale doctrine).[15]

Omega's additional argument, that it "did no more than control the importation and distribution of the Omega Globe" as do any number of other copyright owners, (Omega Br. 28), misses the point. It cites in that regard cases in which copyright owners were asserting their exclusive copyright rights for the express and proper purpose of controlling their copyrighted works. (Omega Br. 33). In *A&M Records*, for example, this Circuit rejected the copyright misuse defense in connection with plaintiff record companies' efforts to control online distribution of their work, but did so because there was no evidence that plaintiffs sought to do anything more than control the reproduction and distribution of their

---

[15] Omega claims that the *Swatch* decision is persuasive here. (Omega Br. 26) That case, however, addressed only the first sale doctrine and not copyright misuse. If anything, *Swatch* undercuts Omega's argument because the plaintiffs there, corporate affiliates of Omega, expressly alleged that the copyrighted works they sought to protect were "*creative works*" "*featured* in their watches, as part of the *artwork of the dial*, the design of the band, or unique watch bracelets." *See* Compl. at ¶ 43, *Swatch,* 454 F. Supp. 2d 1245 (No. 1:06-cv-20162) (emphasis added). In sharp contrast to the Omega Globe, those elements made them a vital part of the watches' consumer appeal, wholly unlike the minuscule, hidden and unpublicized insignia on the back of the Seamaster watch.

copyrighted works.  *See* 239 F.3d at 1026-27.[16]  Omega also cites *Micro Star v. Formgen Inc.*, 154 F.3d 1107 (9th Cir. 1998), but that case did nothing more than acknowledge in passing in a footnote that the defendant had alleged misuse and, without analysis, stated that "nothing indicates that [plaintiff] abused its copyright." *Id.* at 1114 n.8.

These cases are entirely distinguishable.  Omega, unlike a record company, computer software vendor or videogame manufacturer, is not asserting copyright rights for the purpose of controlling the unauthorized reproduction and distribution of copyrighted works, or for any purpose having to do with creativity.  Instead, it is attempting to control the importation and distribution of physical products — the watches.

Omega also attempts to cast doubt on the District Court's reasoning by drawing a distinction between "subjective motives" and "objective use of the

---

[16] The other cases cited by Omega are no different because each of them stands for the commonplace proposition that a copyright plaintiff seeking to enforce its copyrights to control unauthorized reproduction or distribution of its copyrighted works does not, "without more," engage in copyright misuse.  *See, e.g., Arista Records, Inc. v. Flea World*, *Inc.*, 356 F. Supp. 2d 411, 428 (D.N.J. 2005) (copyright enforcement, "without more," "cannot constitute copyright misuse"); *Advanced Computer Servs. of Mich., Inc. v. MAI Sys. Corp.*, 845 F. Supp. 356, 370 (E.D. Va. 1994) (no misuse if copyright holder is "simply attempting to protect [its] rights").  Here, of course, Omega's course of conduct is, indeed, something "more" than "simply attempting" to protect its copyright rights — it is an attempt to prohibit the distribution of watches through a channel that it finds objectionable as a competitive matter.

copyright." (Omega Br. 31, 32) It asserts that the District Court's holding was based on an "implied disapproval" of Omega's conceded "purpose" of controlling the importation and sale of its uncopyrighted watches. (Omega Br. 31-32 & n. 9) The cases on copyright misuse do not draw, or provide any support for, any such distinction.[17]

Omega attempts to limit evidence of its intention by arguing that copyright misuse is solely an objective, rather than subjective, doctrine. It bases this conclusion on its assertion that prior decisions examined objective evidence in finding or rejecting misuse claims. Courts have sometimes looked solely at objective facts for the obvious reason that the types of admissions obtained here, *see supra* section I.D, are rare. *Cf. Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*, 552 F.3d 1033, 1050 (9th Cir. 2009) ("it would be naive to expect that someone who had sought to deceive the PTO would state in a deposition that this had been his intent. We are therefore generally obliged to rely on circumstantial

---

[17] In support of this distinction, Omega cites principally to *Religious Tech. Ctr.*, 1996 WL 633131. There, however, defendant had argued that plaintiff's real objective in bringing its infringement action was to gain access to the defendant's computer files where copied material was located, and to "harass, burden, and punish" the defendant for his criticism of Scientology. *Id*. at *11. The court rejected the copyright misuse defense — which was predicated on defendant's assertion that plaintiff had "ulterior motives" — because the plaintiff's infringement action was a "legitimate invocation" of its copyright, and was not asserted "in an improper or offensive manner not intended by the copyright laws." *Id*. at *12.

evidence in Walker Process fraud cases."). Nothing in any case cited by Omega suggests that a district court is precluded from considering such admissions where they exist and where they are, for the reasons noted above, dispositive.

Omega's effort to distinguish subjective intent and objective facts finds no support in the case law and for good reason. Copyright misuse is an equitable defense. When a court is called upon to weigh the equities raised by an equitable defense, all of the facts, which may well include the motivations and purposes of a copyright plaintiff, are relevant. No purpose is served by a court, sitting in equity, excluding consideration of a plaintiff's anticompetitive, or any other, purposes as to which a copyright misuse defense might well be an appropriate response. *See In re Mitan*, 573 F.3d 237, 245 (6th Cir. 2009) (a court in equity "may always consider the presence of bad faith on the part of one of the parties"); 27A Am. Jur. 2d Equity § 89 (2008) (equitable relief "regards as done that which ought to be done in fairness and good conscience"); *cf. Brown v. Plata*, 131 S. Ct. 1910, 1944 (2011) (district court's equitable powers are "broad, for breadth and flexibility are inherent in equitable remedies" (internal quotation marks and citations omitted)).

In this case, Omega's misuse is readily apparent, whether one looks at it through the lens of subjective intent or objective conduct. Unlike copyright plaintiffs that legitimately seek to protect the expression contained in their copyrighted works, both Omega's intentions and its actions demonstrate it is using

its copyright in the Omega Globe in an effort to control distribution of its Seamaster watches. Omega has admitted that the intent behind affixing the Omega Globe to Seamaster watches "was to prevent unauthorized dealership" of those watches, (2 SER 170-71), and to help "stem the tide of the gray market." (2 SER 183-84) It acknowledged that a "favorable result on [its] reading of the copyright law *as a vehicle to stop the gray market* will be applicable to all brands and not just Omega." *Id.* (emphasis added).

Omega's objective conduct also speaks volumes. It placed the Omega Globe on the back of its Seamaster watches where it cannot be seen. The size is miniscule. There never has been the slightest effort to advertise or publicize the Omega Globe. It was engraved on the *back* of the Seamaster watches for the very purposes for which the parties are now litigating — to stop parallel importation. This course of conduct overwhelmingly supports the view that Omega was not trying to control its protected expression but, instead, was hoping to use copyright law to block the importation and distribution of its Seamaster watches. Whether looked at from the standpoint of subjective intent or objective conduct, Omega's attempt to leverage its monopoly power into control over uncopyrighted products constitutes copyright misuse.

**II.    THE DISTRICT COURT PROPERLY DENIED PARTIAL
SUMMARY JUDGMENT IN OMEGA'S FAVOR ON COSTCO'S
AFFIRMATIVE DEFENSE BASED ON COPYRIGHT MISUSE**

Because, for the reasons discussed above, the defense of copyright misuse

applies in this case, the District Court's denial of Omega's motion for partial

summary judgment on Costco's affirmative defenses based on copyright misuse

was proper.

**CONCLUSION**

For all of the above reasons, this Court should affirm the judgment of the

District Court.

DATED: July 19, 2012                DEBEVOISE & PLIMPTON LLP
                                    Bruce P. Keller
                                    Jeffrey P. Cunard

                                    GREENBERG GLUSKER FIELDS
                                    CLAMAN & MACHTINGER LLP
                                    Norman H. Levine
                                    Aaron J. Moss


                                    By: /s/ Aaron J. Moss
                                    _____
                                        AARON J. MOSS (SBN 190625)
                                        Attorneys for Appellee
                                        Costco Wholesale Corporation

## CERTIFICATE OF COMPLIANCE
### Pursuant to Fed. R. App. P. 32(a)(7)(C)

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, I

certify that Appellee's brief is proportionately spaced, has a typeface of 14 points

and contains 9,271 words.

DATED:  July 19, 2012        DEBEVOISE & PLIMPTON LLP
                                  Bruce P. Keller
                                  Jeffrey P. Cunard

                                  GREENBERG GLUSKER FIELDS
                                  CLAMAN & MACHTINGER LLP
                                  Norman H. Levine
                                  Aaron J. Moss

                                  By: /s/ Aaron J. Moss
                                      AARON J. MOSS (SBN 190625)
                                      Attorneys for Appellee
                                      Costco Wholesale Corporation

## <u>STATEMENT OF RELATED CASES</u>
### (Ninth Circuit Rule 28-2.6)

Pursuant to Ninth Circuit Rule 28-2.6, Costco states that Ninth Circuit

Appeal No. 12-56342 (appeal from attorneys' fee award) is related to this Appeal

No. 11-57137 (appeal from grant of summary judgment).

## CERTIFICATE OF SERVICE

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is Greenberg, Glusker, Fields, Claman & Machtinger LLP, 1900 Avenue of the Stars, 21st Floor, Los Angeles, California 90067.

I hereby certify that on July 19, 2012, I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I declare that I am employed in the office of a member of the bar of this court at whose direction the electronic filing and service was made.


/s/ Jannette G. Gore
Signature